**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

JASON LEE BADGLEY,

    Petitioner,                                   Civil No. 2:08-CV-13279
                                                     HONORABLE ARTHUR J. TARNOW

v.

SUSAN DAVIS, WARDEN,

    Respondent.
_____/

**OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS
AND GRANTING A CERTIFICATE OF APPEALABILITY**

Jason Lee Badgley, ("Petitioner"), presently incarcerated at a Michigan correctional facility, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his application for habeas relief, Petitioner challenges his conviction for second-degree murder, MICH. COMP. LAWS § 750.317, and first-degree child abuse. MICH. COMP. LAWS § 750.136(B)(2). For the reasons stated below, the petition for a writ of habeas corpus will be denied.

**I.  BACKGROUND**

This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009):

> Defendant was convicted of killing his five-week-old son on September 11, 2004, in defendant's Clinton Township apartment. Vikki Lee Gohsman, the victim's mother and defendant's fiancee, testified that she and her three-year-old son [n1] left their apartment at about 10:00 a.m., leaving the victim with defendant. When Gohsman returned home at 3:30 p.m.,

defendant was administering CPR to the victim. Gohsman described defendant as being very upset, and described the victim as being blue and unresponsive. Defendant directed Gohsman to call 911, and Gohsman used a neighbor's phone to do so. Clinton Township police officers arrived, and observed the victim lying on his back on the floor, and described him as "blue in color" and unresponsive. As the officers were administering CPR on the victim, defendant came in and said that he thought he broke the victim's arm. Emergency personnel arrived, and transported the victim to the hospital, where he was pronounced dead. A medical examiner advised the officers that the victim suffered skull fractures in three places, broken ribs, and a broken arm. A police officer testified that defendant was thereafter arrested because his initial explanation of how the child was injured did not coincide with the victim's injuries.

n1 Defendant is not the biological father of Gohsman's three-year-old son.

Police officers testified that, throughout their questioning, defendant would change or add information regarding how the victim was injured. Defendant initially told police officers that the victim woke up crying at about 1:00 p.m., and he tried to calm the victim but nothing worked. At one point, defendant fell asleep as he was bouncing the victim on his lap, and the victim fell between defendant's legs. When defendant tried to grab the victim's left arm to prevent him from falling, he caught his hand or arm and heard a loud pop. Defendant subsequently told the officers that, at one point, he was holding the victim, and the victim twisted out of his arms, fell to the floor, and broke his arm. Defendant explained that at some point after the victim was on the floor, the victim continued crying and he stated, "Get this kid the f**k away from me." Defendant then pushed the victim across the room with his foot on his buttocks, resulting in the victim traveling about five feet. Defendant explained that the victim's head injuries could have been caused by him hitting his head on a bottle or shoe when he fell, or as he was traveling across the carpet. Defendant stated that he was very frustrated and, at one point, grabbed the victim around the neck with two hands and squeezed it for a second or two. The victim stopped breathing briefly. The victim's crying then accelerated. Defendant stated that he picked up the victim with two hands in the chest area, and shook him "pretty hard." The victim continued to cry and "was getting pissy," and defendant "jab[bed]" the victim once in the back of the head with a closed fist. The incident lasted 10 to 15 minutes. Defendant stated that he "didn't want to hurt him."

The Macomb County medical examiner testified that the autopsy revealed that the victim had no prior medical conditions, and suffered "severe injuries." An external examination showed a contusion on the right side of the head, "small bruising and a small abrasion on the undersurface of the

2

chin," bruising on the inner surface of the upper lip, and "a gross deformity of the right forearm secondary to displaced fractures." The bruising in the neck area indicated "some type of impact or movement of something around the neck." The internal examination revealed a skull fracture, subdural hematoma, subarachnoid hemorrhage, brain swelling, and retinal and optic hemorrhages. The head injuries indicated a "significant blunt impact," such as one caused by a fist. The retinal hemorrhages were either the "direct result of the severe impact to the head, or a secondary component of shaking." The victim also suffered six acute rib fractures and acute chest wall hemorrhage, caused by "aggressive grabbing and squeezing of the child's chest." The victim had a displaced arm fracture, with two broken bones. The medical examiner determined that the cause of death was "blunt head injuries," and the manner of death was homicide.

Defendant's father and Gohsman testified, and described defendant as being a loving and caring father, who was excited and proud about the victim's birth, and who never abused the victim or Gohsman's three-year-old son. Gohsman also testified that, on September 10, 2004, the victim "seemed to be getting sick," was "crankier than usual, "and was "very difficult" to "calm down."

*People v. Badgley*, 2007 Mich. App. LEXIS 103, *1-2 (Mich. Ct. App. Jan. 23, 2007).

Following his trial, Petitioner was sentenced to serve 34-to-60 years in prison for the murder conviction and 9-to-15 years for the child abuse conviction. Petitioner filed an appeal of right. His appellate brief raised nine claims:

I. It was reversible error, in violation of defendant's right to a properly instructed jury, for the trial court to deny defendant's request to instruct the jury on the lesser included offenses of voluntary and involuntary manslaughter where evidence supporting those offenses was admitted at trial.

II. It was reversible error, in violation of defendant's right to a properly instructed jury, for the trial court to deny defendant's request to instruct the jury on the lesser included offense of child abuse, third degree.

III. Defendant was denied his constitutional right to present a defense when the trial court refused his request to elicit testimony from defense witnesses bearing on defendant's state of mind.

3

> IV. Under the totality of the circumstances, defendant's inculpatory statements to the police during his custodial interrogation were involuntary, and their admission denied defendant a fair trial.
>
> V. The trial court erred by admitting into evidence a gruesome autopsy photograph that was cumulative of testimony and was intended to invoke outrage among the jurors, thus denying defendant a fair trial.
>
> VI. The trial court's decision to admit into evidence and play for the jury a videotape of defendant's interrogation by the police was error due to the failure of the prosecution to establish a chain of custody for the videotape.
>
> VII. The evidence was insufficient to support the charge of first-degree felony murder and defendant's motion for a directed verdict of acquittal should have been granted by the trial court.
>
> VIII. The jury's verdict of guilty as to second-degree murder was against the great weight of the evidence such that a verdict of acquittal should have been entered by the trial court.
>
> IX. Defendant was sentenced in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution insofar as the trial court, in order to score defendant's legislative sentencing guidelines, made findings of fact with respect to facts neither charged in the information nor found by the jury beyond a reasonable doubt.

The Michigan Court of Appeals affirmed Petitioner's conviction and sentence in an unpublished opinion. *Badgley*, *supra*. Petitioner filed an application for leave to appeal in the Michigan Supreme Court that raised the same nine issues. The application for leave to appeal was denied by form order. *People v. Badgley*, 2007 Mich. LEXIS 1676 (Mich., July 30, 2007).

In his habeas petition, Petitioner seeks a writ of habeas corpus on the following two grounds:

> I. The instructions given by the state trial court to Petitioner's jury were defective because they omitted instructions on the necessarily included lesser offense of voluntary and involuntary manslaughter and the absence of those required instructions so infected the entire proceeding that the resulting conviction violated due process.

II. Petitioner was denied his constitutional right to present a defense when the trial court refused his request to elicit testimony from defense witnesses bearing on Petitioner's state of mind.

## II. STANDARD OF REVIEW

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

>   (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>   (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

5

### III. DISCUSSION

#### A. <u>Jury Instructions</u>

Petitioner's first claim asserts that he is entitled to habeas relief because the trial court refused to instruct the jury on the lesser offense of manslaughter. Petitioner points to *Hopper v. Evans*, 456 U.S. 605, 611 (1982), as recognizing a federal constitutional right to a lesser offense instruction where the evidence presented at trial supports it. Respondent asserts that the claim is not cognizable because it cannot be supported by clearly established Supreme Court law as required by § 2254(d).

In *Hopper*, the Supreme Court ruled that a capital defendant is entitled to a lesser included offense instruction when there is evidence to support it. But the Supreme Court has since declined to decide whether this right extends to noncapital cases. In *Beck v. Alabama*, 447 U.S. 625, 638 n.14 (1980), the Court stated that "[w]e need not and do not decide whether the Due Process Clause would require the giving of such instructions in a noncapital case."

In light of this statement by the Supreme Court in *Beck,* the United States Court of Appeals for the Sixth Circuit has stated that the failure to instruct on a lesser included offense in a noncapital case does not violate due process. *Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002). Accordingly, Petitioner's first habeas claim cannot be supported by clearly established Supreme Court law as required by § 2254(d).

But even if the claim were cognizable, it would not provide a basis for granting habeas relief because the Michigan Court of Appeals reasonably found that no rational view of the evidence supported a voluntary manslaughter charge:

>"[T]o show voluntary manslaughter, one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions." [*People v. Mendoza,* 644 N.W.2d 685 (Mich. 2003). "[P]rovocation is that circumstance that negates the presence of malice." *Id*. at 536. The degree of provocation required to mitigate a killing from murder to manslaughter "is that which causes the defendant to act out of passion rather than reason." *People v. Sullivan*, 586 N.W.2d 578 (Mich. App. 1998). "[T]he provocation must be adequate, namely, that which would cause a reasonable person to lose control." *Id.* (emphasis in original). "The determination of what is reasonable provocation is a question of fact for the fact-finder." *Id.* But "[w]here, as a matter of law, no reasonable jury could find that the provocation was adequate, the court may exclude evidence of the provocation." *Id.*
>
>Contrary to defendant's argument, no reasonable jury could find that the provocation here was adequate to cause a reasonable person to lose control. Defendant argues that adequate provocation existed because he "was sick," the victim "had a cold, was cranky, had been up all night and hence Defendant had been up all night, and that the victim could not be soothed." Defendant adds that he had "straightened [sic] financial circumstances," and as he told the police officers, he did not intend to hurt the victim. But a five-week-old baby crying incessantly, having a cold, and being "crankier than usual" is not adequate provocation to move a reasonable person to choke, jab, kick, and forcefully shake the infant over a period of 10 to 15 minutes. Because a rational view of the evidence did not support a voluntary manslaughter instruction, the trial court did not err by refusing to provide that instruction.

There is nothing objectively unreasonable about the state court's analysis. Manifestly, nothing a five-week-old baby could do could possibly constitute adequate provocation for homicide.

The Michigan Court of Appeals also reasonably rejected Petitioner's claim with respect to an involuntary manslaughter charge:

>The trial court also did not err in refusing to instruct the jury on involuntary manslaughter. Defendant argues that the evidence "clearly supports" that he acted without malice, and "committed an unlawful act . . . with an intent to injure, or grossly negligently. . ." As it relates to this case, if a homicide "was committed with a lesser mens rea of gross negligence or an intent to injure, and not malice, it is not murder, but only involuntary

7

manslaughter." *People v. Holtschlag*, 684 N.W.2d 730 (Mich. 2004) (emphasis added). "Malice is defined as 'the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm.'" *People v. Werner*, 659 N.W.2d 688 (Mich. App. 2002) (citation omitted).

      The evidence showed that the injuries inflicted on the five-week-old victim by defendant were extremely forceful and would naturally tend to, and did in fact, cause death. Defendant admitted that he "jab[bed]" the infant in the head with a closed fist, held the infant with two hands and shook him "pretty hard," choked the infant causing him to cease breathing momentarily, and shoved him with his foot to a degree that the infant traveled approximately five feet. As a result of defendant's acts, the victim suffered a skull fracture, subdural hematoma, subarachnoid hemorrhage, brain swelling, retinal and optic hemorrhages, six acute rib fractures and acute chest wall hemorrhage, and a displaced arm fracture. Because no rational juror, under these facts, could conclude that defendant's acts on this five-week-old victim were anything other than acts committed with malice, the trial court did not err by refusing to provide an involuntary manslaughter instruction.

There was no serious challenge at trial made to the medical evidence regarding the severity of the victim's injuries. The infant had a fractured skull, six fractured ribs, a displaced arm fracture, and several other severe injuries. Given the fact that the element of malice under state law may be satisfied by showing an intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm, no rational view of the evidence could support an involuntary manslaughter instruction.

Accordingly, Petitioner's first habeas claim is not cognizable, and even if it were reviewable, the state court reasonably rejected it.

### B. Exclusion of Defense Evidence

Petitioner's second claim asserts that he was denied his right to present a defense when he was prevented from eliciting Gohsman's opinion on cross-examination that

8

Petitioner did not intend to hurt the victim. The trial court viewed the proffered lay opinion evidence as a request to present a diminished-capacity defense, and the court excluded it because such a defense is not recognized by Michigan law. The Michigan Court of Appeals largely agreed with this assessment and denied Petitioner relief. Respondent argues that the state court adjudication of the claim was not objectively unreasonable.

After opening statements, the parties discussed the bounds Gohsman's testimony regarding the circumstances of Petitioner's life at the time of the victim's death. The trial court stated that it would allow Gohsman to testify about Petitioner's relationship with her and the children and the hardships he encountered, but because she was not present at the time Petitioner caused his son's death, she would not be permitted to speculate "as to what the defendant could have done or did on the date in question."  T II, at 144-145.

The following colloquy then occurred:

Counsel:  Your Honor, with all respect, you're ordereing that she cannot testify that given her experience with this man, given what she knows about him, a more intimate relationship than any in the world, that she can't testify as to whether or not she thinks he would intend to hurt the baby or not?

Trial Court:  Up to that point that she left that morning, she can testify to anything. What happened after she left, she is not, under any set of circumstance, going to be qualified to testify what happened, what she thinks happened in that room.

*      *      *

Counsel:  So as long as I qualify it, you don't know what was in his mind that day, but given what you know about him, that's all fair game, correct?

Trial Court:  No.

9

> Counsel:     No?
>
> Trial Court: What you know about him, do you believe he committed this offense, or he had the intent to hurt that baby at that time, no that's not a fair question. . . . [S]he is not in a position and there cannot be a foundation, it would be absolute speculation on her part. She can talk about anything she wants up to how she observed their relationship, what the relationship was like, did she ever observe any hostility or any abuse relative to the child, all that is fair.

T II, 145-146.

The next morning, defense counsel revisited the issue to seek clarification on the trial court's ruling. Defense counsel again argued that Gohsman should be allowed to testify as to her opinion about Petitioner's state of mind, and "what he was capable of and not capable of" due to her experience with him. T III, at 7-8.

The trial court clarified it's ruling:

> You may have the witness testify as to her observations, her opinions relative to her observations. And her opinions, did the defendant treat the child in a loving, caring manner in your presence. Those are somewhat subjective, not opinions, but subjective observations as opposed to objective analysis. So those subjective determinations, and opinions, did he have the capability, the intent to injure this child, would he ever have formulated an intent, those things are opinions that certainly are not admissible. But her observations as to the care, treatment, even with the subjective analysis that it was loving, caring, thoughtful, considerate, those subjective analyses are appropriate.

T III, 8-9.

During defense counsel's cross–examination of Gohsman, he elicited testimony about her relationship with Petitioner and her opinion of Petitioner as a loving parent. Gohsman testified that she had known Petitioner for ten years, and that they had been dating for the past two and one-half years.

> Counsel:     No?
>
> Trial Court: What you know about him, do you believe he committed this offense, or he had the intent to hurt that baby at that time, no that's not a fair question. . . . [S]he is not in a position and there cannot be a foundation, it would be absolute speculation on her part. She can talk about anything she wants up to how she observed their relationship, what the relationship was like, did she ever observe any hostility or any abuse relative to the child, all that is fair.

T II, 145-146.

The next morning, defense counsel revisited the issue to seek clarification on the trial court's ruling. Defense counsel again argued that Gohsman should be allowed to testify as to her opinion about Petitioner's state of mind, and "what he was capable of and not capable of" due to her experience with him. T III, at 7-8.

The trial court clarified it's ruling:

> You may have the witness testify as to her observations, her opinions relative to her observations. And her opinions, did the defendant treat the child in a loving, caring manner in your presence. Those are somewhat subjective, not opinions, but subjective observations as opposed to objective analysis. So those subjective determinations, and opinions, did he have the capability, the intent to injure this child, would he ever have formulated an intent, those things are opinions that certainly are not admissible. But her observations as to the care, treatment, even with the subjective analysis that it was loving, caring, thoughtful, considerate, those subjective analyses are appropriate.

T III, 8-9.

During defense counsel's cross–examination of Gohsman, he elicited testimony about her relationship with Petitioner and her opinion of Petitioner as a loving parent. Gohsman testified that she had known Petitioner for ten years, and that they had been dating for the past two and one-half years.

When the couple starting living together, Gohsman already had a one-year-old son, Devin, from a previous marriage. She testified that Petitioner spent an enormous amount of time with her son, and that he loved playing with Petitioner. Gohsman testified that Petitioner "was a great father to Devin." Petitioner never hit Devin and loved him.

When Gohsman's father passed away, she became depressed and withdrawn and "took things out" on Petitioner. Meanwhile, Petitioner was having difficulty providing for his family and was only bringing home $150 each week from his work at a body shop.

When Gohsman became pregnant, she testified that Petitioner was very excited. The pregnancy was difficult and Gohsman nearly miscarried. Then, as defense counsel began to inquire further about the stress caused by the pregnancy, the prosecutor objected, asserting that the questioning was getting "far afield." Defense counsel responded that this line of testimony was relevant to understanding Petitioner's state of mind at the time his son died:

> I'm not going for an insanity defense here. I'm not going for diminished capacity. What I'm trying to establish is that, Judge, these people - that this man first of all loved his children. . . . That he was kind and gentle, through prior conduct, to demonstrate he was kind and gentle to these kids. . . . But that their life was not trouble-free, their life in fact was very troubled, very troubled, and that there was a tremendous amount of pressure and stress, as you've said. . . . Judge, this isn't a jury nullification argument. This is, you know, conduct that is outside of the otherwise portrayed personality of this guy on this day. And the whole question is, what happened, was this felony murder, was this second degree murder, was this manslaughter, was this whatever. And if we can't get into facts surrounding state of mind, how can I defend it? How can I do that, Judge? I can't.

T III, 62-63.

11

The trial court disagreed with defense counsel's characterization of the proposed evidence, and precluded Gohsman from testifying as to her opinion of Petitioner's state of mind at the time of the offense:

> That is diminished capacity, and that - there is no other characterization for what's taken place.  I'm sorry, counsel, I don't see it.
>
> Now, I recognize that the person before this jury, you have a right, and I am not stopping you from the environment, his relations with all persons, that she had - and I've given you some latitude, that the complainant's finacee was suffering depression as a result of lost family members, sickly, or whatever the case may be, and that he had additional responsibility and was able to take care of the children, this was their routine standard practice in the house, that's fine.  You can demonstrate what was going on in this household, but I'm not going to allow you to continue to suggest to this jury that the stress associated with the economics resulted in - and it's clear to me that the argument had been diminished capacity, and that it not going to be permitted.

T III, 64-65.  See also T III, at 73.

Defense continued with his cross-examination, eliciting testimony that the victim was born three weeks early.  Petitioner was very excited by his son's birth, and took him to church and to visit his family.  Gohsman testified that Petitioner helped with the baby tremendously.  He performed most of the feedings and diaper changes, not because she asked him to, but because he wanted to do those things.

Gohsman testified that the baby had a cold the week of his death.  He cried all the time and it was difficult to clam him down and stop him from crying.  On the day of the baby's death, Gohsman left the house with her mother and suggested that she take the baby.  Petitioner asked her to leave the baby home, though, because he was still sick.  When she returned home, she saw Petitioner performing CPR on the baby.  Petitioner was very upset and was crying.  She rode with the baby in the ambulance, and Petitioner drove

separately. When she saw Petitioner at the hospital, the police had already placed him in handcuffs.

The record shows, therefore, that Petitioner was allowed to present testimony regarding the circumstances of his life and relationship with Gohsman and her children. Gohsman was allowed to, and did in fact, testify to her opinion that Petitioner loved his son and was a good father. What the trial court prevented Petitioner from introducing was Gohsman's opinion of what was in Petitioner's mind at the time he caused his son's death.

The state courts and Respondent characterize this excluded opinion evidence as probative only of a diminished capacity defense. And that would be true if defense counsel was attempting to elicit from Gohsman that because of the stress in Petitioner's life he was *incapable* of forming the intent to hurt his son. But that is not what defense counsel proposed to do. Instead, he intended to elicit Gohsman's opinion that, based on her intimate knowledge of Petitioner, Petitioner did not in fact intend to hurt his son when he caused his death. That is, Petitioner proposed to offer lay opinion testimony that he *did not* act with malice, not that he *could not* act with malice.

Federal law is clear on the right to present a defense. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he also has the right to present his own witnesses to establish a defense. This right is a fundamental element of the due process of law. *Washington v. Texas*, 388 U.S. 14, 19 (1967)*; Crane v. Kentucky*, 476 U.S. 683, 690 (1986). However, an accused in a criminal case does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under the standard rules of evidence. *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996). The Supreme Court gives trial court judges "wide latitude" to exclude

13

evidence that is repetitive, marginally relevant, or that poses a risk of harassment, prejudice, or confusion of the issues. *Id.* (*quoting Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

If the excluded evidence in this case was only being offered for the purposes of demonstrating that Petitioner did not have the capacity to form the mental state of malice, as Respondent argues, then this case would be relatively straightforward. *See Wong v. Money*, 142 F.3d 313, 324 (6th Cir. 1998) (Petitioner's right to present a defense was not violated by the exclusion of expert testimony regarding Petitioner's capacity to form required mental state because diminished capacity is not a recognized defense under Ohio law).

But that argument is a straw-man. Petitioner was not attempting to present a diminished capacity defense. Petitioner was attempting to elicit lay opinion testimony regarding his mental state at the time of the offense. The trial court did not address this aspect of the issue, and the Michigan Court of Appeals only briefly discussed it, finding that the proposed opinion testimony was properly excluded because it "called for speculation," and because "there was no basis for Gohsman to give an opinion based on a direct observation of defendant because she was not home at the time of the offenses. . . ." *Badgley*, *supra*, at \*5.

It is difficult to square this conclusion with Michigan law. Under state law, a witness who is not testifying as an expert may testify in the form of opinions or inferences that are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." *People v. Yost*, 749 N.W.2d 753, 768 (Mich. Ct. App. 2008). Michigan Courts have "liberally

14

applied MRE 701 in order to help develop a clearer understanding of facts for the trier of facts." *People v. Oliver*, 427 N.W.2d 898 (Mich. App. 1988). There is no exception to this rule that would prohibit lay opinion testimony regarding a defendant's mental state at the time of the offence. A lay witness may opine about the mental condition of the accused at the time of the charged offense, although he must base his opinion on "the facts and circumstances within [his] own knowledge." *People v. Cole*, 172 NW2d 354, 361 (Mich. 1969).

Here, the trial court's mischaracterization of Petitioner's proffered evidence - as being offered only to show diminished capacity - prevented Petitioner from presenting lay opinion testimony about his mental state at the time of the offense. The proposed lay opinion testimony from Gohsman that Petitioner did not intend to hurt his son would have been rationally based on her perceptions of Petitioner's circumstances and relationship with his son during the time-period of the victim's death. While Gohsman did not directly observe the actions that resulted in her son's death, her intimate knowledge of the circumstances of Petitioner's life situation could have allowed her to form a rational opinion regarding his mental state on the date of the offense. Indeed, the opinion testimony would not have been different in kind from other types of lay opinion testimony offered by the prosecution concerning a defendant's mental state at the time of a crime. *See, e.g., People v. Kuipers*, 2000 Mich. App. LEXIS 360 (Mich. Ct. App. Dec. 26, 2000) (Doctor's lay opinion that defendant intentionally rather than accidently caused the burn in child abuse case properly admitted under MRE 701); *People v. Edward Ford*, 2008 Mich. App. LEXIS 853 (Mich. Ct. App. Apr. 29, 2008) (Officer's opinion testimony that defendant

15

intended to ram the victim's vehicle based on his observations of the accident scene properly admitted under MRE 701).

However, it is not enough for Petitioner to show merely that the trial court erred in prohibiting Gohsman from giving her opinion as to Petitioner's mental state. Petitioner must show that he was denied "'a meaningful opportunity to present a complete defense.'" *Crane*, 476 U.S. at 690.  That is, a violation of the right to present a defense is not established by showing merely that the trial court excluded evidence relevant to a defense. Rather, a petitioner must show that the exclusion of evidence "significantly undermined fundamental elements of the accused's defense." *United States v. Scheffer*, 523 U.S. 303, 315 (1998).

Here, the exclusion of Gohsman's opinion testimony did not significantly undermine the fundamental elements of Petitioner's defense.  Petitioner's defense  conceded that he caused his son's death.  He based his defense on his statement to police that he did not intend to harm his son but that he was tired and frustrated and only "wanted some quiet." T IV, at 82-83.  This defense was adequately presented through the testimony of Gohsman and Petitioner's father who testified regarding the stress and circumstances in Petitioner's life.  It was also supported by Gohsman's testimony that Petitioner was a good father and loved and cared for his son.  The only piece of evidence relevant to this defense that was excluded was Gohsman's follow-on opinion that Petitioner did not intend to harm his son. But "seldom will be the case when a lay opinion on an ultimate issue will meet the test of being helpful to the trier of fact since the jury's opinion is as good as the witness' and the witness turns into little more than an 'oath helper.'" *Mitroff v. Xomox Corp.*, 797 F.2d 271, 276 (6th Cir. 1986). That is the case here.  The jury had before it

what little evidence Petitioner had to muster to establish that he did not intend to harm the victim. The addition of his finacee's opinion would have added little weight to this defense.

Moreover, given the severity of the victim's injuries, the defense had little chance of success no matter how it was supported. To establish malice sufficient for second-degree murder, the prosecutor had to prove only that Petitioner had the "intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Badgley, supra,* at *9-10. Petitioner's defense that he did not specifically intend to harm his son but only intended to gain some quiet did not speak to this aspect of the malice element. Petitioner admitted to police that he punched his five-week-old son in the back of the head, rung his neck until he stopped breathing, shook him "pretty hard," and kicking him five feet across the floor. These are intentional acts. Irrespective of whether his intent in performing them was specifically to cause harm or to cause quiet, the admissions overwhelmingly showed that he at least intended to do an act with disregard that it would cause death or great bodily harm. Gohsman's omitted opinion testimony that she did not believe Petitioner intended to harm his son would not have significantly undermined this theory of guilt.

Accordingly, although the trial court erred in prohibiting Gohsman from giving lay opinion testimony as to Petitioner's mental state on the day of offense, the error did not significantly undermine fundamental elements of the accused's defense so as to render his trial fundamentally unfair. The claim will therefore be denied.

### IV. Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of

the Rules Governing Section 2254 Proceedings, which was amended as of December 1, 2009, requires that a district court must:

> issue or deny a certificate of appealability when it enters a final order adverse to the applicant.... If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2).

Rule 11, Rules Governing Section 2254 Proceedings.

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Courts must either issue a certificate of appealability indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); FED. R. APP. P. 22(b); *In re Certificates of Appealability*, 106 F.3d 1306, 1307 (6th Cir. 1997). To receive a certificate of appealability, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotes and citations omitted).

The Court finds that reasonable jurists could debate whether this Court correctly denied Petitioner's claim regarding his right to present a defense. The trial court mischaracterized the purpose for which Gohsman's opinion testimony was being offered and improperly excluded it. Reasonable jurists could disagree on whether this error was serious enough to constitute a violation of Petitioner's constitutional right to present a defense. Accordingly, a certificate of appealability will be granted with respect to this issue.

The Court found that Petitioner's first claim cannot be supported by clearly established Supreme Court law. This conclusion would not be debatable among reasonable jurists. A certificate of appealability will therefore be denied with respect to Petitioner's first claim.

## V. ORDER

IT IS ORDERED that the Petition for Writ of Habeas Corpus is **DENIED.**

IT IS FURTHER ORDERED That a Certificate of Appealability is **GRANTED** with respect to Petitioner's second habeas claim asserting a violation of his right to present a defense but **DENIED** with respect to his other claim.


        S/Arthur J. Tarnow
        Arthur J. Tarnow
        Senior United States District Judge

Dated: February 15, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on February 15, 2011, by electronic and/or ordinary mail.

        S/Catherine A. Pickles
        Judicial Secretary